880 P.2d 142

**In re the Marriage of Anne M. STINE, Petitioner–Appellant,**

v.

**Douglas R. STINE, Respondent–Appellee.**

No. 1 CA–CV 92–0522.

Court of Appeals of Arizona, Division 1, Department B.

Aug. 23, 1994.

386

Kathleen A. Kelly, Phoenix, for petitioner-appellant.

Burch & Cracchiolo, P.A. by Daryl Manhart and Donald W. Lindholm, Phoenix, for respondent-appellee.

## OPINION

JACOBSON, Acting Presiding Judge.

This decision is published as an opinion primarily because it deals with a contractual provision in a domestic relations judgment dealing with retirement benefits, which may be in widespread use in Arizona.

This appeal concerns the distribution of the retirement benefits of Douglas R. Stine ("Doug") to his former wife, Anne M. Stine ("Anne"). The trial court determined that the benefits had been distributed as required by the parties' divorce decree. The court subsequently denied Anne's motion for a new trial, rejecting her arguments that a new trial was mandated either by an accident or surprise that could not have been prevented by ordinary prudence, or by a decision that was contrary to law. Anne appeals from the trial court's denial of her motion for a new trial. We affirm.

## FACTS AND PROCEDURAL HISTORY

Anne and Doug were divorced on November 20, 1989. At the time their decree of dissolution was entered, Doug had been employed by the Arizona Department of Public Safety ("DPS") for 19 years and 4 months, a total of 232 months. He would become eligible to retire and receive benefits from the Public Safety Retirement System (the "Retirement System") on July 1, 1990, after 20 years, or 240 months, of service with DPS.

The parties had been married for 150 months of that service.

The parties reached agreement on all issues before their divorce decree was entered. The decree provided for the division of the retirement benefits as follows:

13. The Court will enter a QUADRO [Qualified Domestic Relations Order] for the retirement benefit with the Public Safety Retirement System; Petitioner is to receive one half of 150/240 share of the benefits to be payable monthly starting July 1, 1990; Respondent will keep Petitioner on his life insurance until she starts receiving the retirement, or he is disabled, quits or is fired; Petitioner will receive one half of 150/240 of the benefits of the life insurance. In the event that Respondent should quit, be fired or is disabled and then later is rehired by the State of Arizona and elects to redeposit the amount of the accumulated contributions that he had received at the time of this separation from service and his benefits are reinstated according to A.R.S. § 38–781.15B, the Petitioner will have the same option to reinstate her benefits in the same proportion as stated above.

As the above language indicates, a qualified domestic relations order [QUADRO] was to be obtained, which would instruct the Retirement System to pay Anne directly. However, the Retirement System advised Anne that it was exempt from the statutory QUADRO provisions pursuant to A.R.S. § 38–850(C), and could not pay her a share of the retirement benefits until Doug's right to such benefits vested, that is, until Doug actually retired and applied for retirement benefits.

Anne sought to amend the decree to require Doug to pay her one half of 150/240 [1] share of the retirement benefits to her directly until such time as Doug actually retired and she could receive her payments directly from the Retirement System. Doug objected to this request, arguing that Anne

1. This figure represents Anne's interest in the community's interest in the benefits. The numerator represents the total months married while enrolled in the plan (150) and the denominator represents the total time in the retirement plan (240). Neither party has contested this calculation, so we do not address whether the denominator should represent the total time in the pension plan only until the date of dissolution (232). *See Koelsch v. Koelsch,* 148 Ariz. 176, 713 P.2d 1234 (1986).

was not entitled to receive any payment of benefits until he actually chose to retire.

The trial court ruled in Anne's favor and entered an amended decree on October 25, 1990.[2] It stated in pertinent part:

13. Petitioner will receive one half of 150/240 share of the benefits of the Arizona Public Retirement System that will be due to Douglas R. Stine, ... on July 1, 1990. Douglas R. Stine is to pay the share due to Anne Stine beginning July 1, 1990. At such time as Douglas R. Stine applies for and starts to receive benefits from the Retirement System, it is hereby ordered that the Arizona Public Retirement System pays such benefits directly to Anne Stine.... Respondent will keep Petitioner on his life insurance until she starts receiving the retirement, or is disabled, quits or is fired; Petitioner will receive one half of 150/240 share of the benefits of the life insurance. *In the event that Respondent should quit, be fired or is disabled and then later is rehired by the State of Arizona and elects to redeposit the amount of the accumulated contributions that he had received at the time of his separation from service and his benefits are reinstated according to A.R.S. Sect. 38–781.15B, the Petitioner will have the same option to reinstate her benefits in the same proportion as stated above.*

(Emphasis added.)

On November 10, 1990, Doug quit his job with DPS. He received reimbursement of his retirement plan contributions, which totaled approximately $36,000.[3] Doug paid Anne one half of 150/240 share, or 31.25% of these employee contributions—a lump sum distribution of approximately $10,000. He used the remainder to pay off approximately $20,000 in personal debt.

Although Doug was eligible for retirement at the time that he quit, he testified that he could not afford to retire and still meet his financial obligations and maintain a decent standard of living. If he had retired, his share of the monthly retirement benefit would have been about $1,200. He owed Anne child support of $725 per month, plus an additional $50 per month for the children's clothing. He also had to pay off the above-mentioned debts. Moreover, had he retired, he would not have remained employable as a law enforcement officer. Accordingly, Doug quit rather than retire, so he could receive reimbursement of his retirement plan contributions, pay Anne her share, pay off his debts, and remain employable as a law enforcement officer.

On January 14, 1991, Doug was rehired by DPS. His understanding was that, to be reinstated in the retirement plan, he would have had to repay all of the contributions disbursed upon his termination. He could not afford to do so, and he elected *not* to redeposit his share of the retirement into the Retirement System. As a result, Anne could not elect to redeposit her funds into the Retirement System.[4]

Anne filed a petition for order to show cause, requesting enforcement of the amended decree regarding retirement benefits. Anne argued that Doug was not entitled to quit once he became eligible for retirement on July 1, 1990. She claimed that on that date, her rights to receive monthly retirement payments of $592.81 from either Doug or the Retirement System became fixed, and that Doug could not thereafter unilaterally elect to quit and deprive her of her right to receive these payments. In response, Doug argued that the amended decree in no way limited his ability to quit and required only that he provide Anne with her one half of 150/240 share of any monies he received. He claimed that he had given her all that she was entitled to with the lump sum payment.

---

2. By the time the amended decree was entered, Doug was already eligible to retire.

3. Doug's actual contribution totalled $36,716.69, and Anne's 31.25% share of this amount was $11,473.97. Because Arizona state withholding tax was apparently deducted before distribution, the parties' reimbursement amounts were less.

4. Pursuant to both the amended decree and state law (A.R.S. § 38–849(C)), Anne's right to reinvest in the retirement plan hinged on Doug's decision to reinvest.

The trial court ruled in favor of Doug, finding that the amended decree clearly provided that he could quit as long as he divided the monies received and paid Anne her share. Accordingly, the court found that Doug was not in violation of the terms of the amended decree.

Anne sought a new trial under both Rule 59(a)(3), Arizona Rules of Civil Procedure, due to an accident or surprise which could not have been prevented by ordinary prudence, and Rule 59(a)(8), arguing that the court's decision was contrary to law. The trial court denied this motion. Anne timely appeals from the court's denial of her motion for a new trial. The only issue presented is whether the trial court abused its discretion in denying the motion for a new trial.

## DISCUSSION

### A. Scope of the Appeal.

■ Anne's notice of appeal is limited to the order denying her motion for a new trial. Thus, review here is solely to determine whether the trial court abused its discretion in denying that motion. *DeMontiney v. Desert Manor Convalescent Center, Inc.,* 144 Ariz. 21, 29, 695 P.2d 270, 278 (App.1984) ("[a]bsent a clear abuse of discretion, we will not disturb the trial court's denial of a motion for a new trial"), *approved in part, vacated in part on other grounds,* 144 Ariz. 6, 695 P.2d 255 (1985).

Anne's original petition sought an order directing Doug either to elect reinstatement in the retirement plan, or to pay Anne $592.81 per month as if he had elected reinstatement in the plan. The trial court denied that relief. Subsequently, the trial court denied Anne's motion for a new trial.

In her briefs to this court, Anne does not argue that she was entitled to a new trial based on accident or surprise. Instead, she focuses solely on her contention that the trial court's decision on the petition to show cause was contrary to the law. Accordingly, this court must determine if the trial court erred in refusing to grant a new trial on that basis alone.

### B. The Trial Court Did Not Abuse Its Discretion In Denying The Motion For A New Trial.

#### 1. Doug Was Not Required to Reinvest in the Plan.

■ The first issue before the trial court on the petition for order to show cause was whether Doug was entitled to quit his job and forego reinstatement of his benefits when he was rehired. The trial court found that he was entitled to do so under the amended decree.

■ The meaning of a decree is to be determined from the language used. The language of a judgment or decree is to be construed like a contract or other written instrument. *Lopez v. Lopez,* 125 Ariz. 309, 310, 609 P.2d 579, 580 (App.1980). A meaning should not be assigned to part of the language which would render another part meaningless, nor remake the language to alter the existing rights or obligations. *Id.;* see also *Tyson v. Tyson,* 61 Ariz. 329, 339, 149 P.2d 674, 678–79 (1944).

With respect to Doug's ability to quit and seek reinstatement of benefits upon rehiring, the amended decree provided:

> In the event that Respondent should *quit,* be fired or is disabled and then *later is rehired* by the State of Arizona and *elects to redeposit* the amount of the accumulated contributions that he had received at the time of his separation from service and his benefits are reinstated according to A.R.S. Sect. 38–781.15B, the Petitioner will have the *same option* to reinstate her benefits in the same proportion as stated above.

(Emphasis added.)

Contrary to Anne's arguments, the amended decree did not prohibit, but rather specifically provided for, the possibility that Doug would quit his employment. The decree also contemplated that, if Doug quit (or was fired or disabled), he would receive from the retirement plan "the amount of the accumulated contributions that he had received at the time of his separation from service...." The amended decree was entered *after* Doug

had become eligible for retirement.[5] Thus, it supports his argument that he was entitled to quit even after becoming eligible for retirement. Otherwise, the provision regarding quitting in the amended decree would be meaningless.

The decree further provided that, if Doug was rehired by the state after he quit, he could *elect* to redeposit his accumulated contributions back into the retirement plan.[6] This language clearly indicates that such reinvestment in the retirement plan was at his *option*. Thus, Anne's argument that the amended decree required Doug to reinvest in the plan upon being rehired is contrary to its express terms.[7]

### 2. Anne Did Not Receive a Fixed Interest in the Retirement Benefits upon Doug's Retirement Eligibility Date.

■ The petition for order to show cause also raised the issue whether Anne's interest in the retirement benefits became fixed upon July 1, 1990, the date that Doug became eligible to retire. Anne argued that, after that date, she was entitled to receive her $592.81 per month share of the benefits and Doug could not unilaterally decide to quit and thereby decrease her interest.

Again, the amended decree specifically provides that Doug may quit, conditioned only upon his providing Anne with an opportunity to reinvest in the plan should he be rehired and decide to reinstate his benefits. It is true that the amended decree does not specifically set forth how the benefits are to be distributed in the event Doug quits and then either is not rehired or, as is the case

before the court, is rehired but chooses not to reinvest in the plan. However, the language of the amended decree supports the trial court's determination that Doug satisfied his obligations under the decree by paying Anne her one half of 150/240 share of the accumulated benefits he received upon termination of his employment.

First, as discussed above, the amended decree specifically contemplates that if Doug quits he will receive only reimbursement of "his accumulated contributions" to the retirement plan. The amended decree does not indicate that Anne is to receive more than her one half of 150/240 share of these accumulated contributions; neither does it provide that Anne is to receive the present cash value of any accumulated benefits upon Doug's termination of employment, nor does it indicate that she has some fixed interest in the benefits upon his eligibility for retirement that would impact on his ability to quit his job and forego retirement.

Second, even if the amended decree is ambiguous in this regard, the evidence presented to the trial court at the hearing on the initial decree also supports the trial court's conclusion that the parties intended that Anne was only to get her share of what Doug received. When discussing the parties' agreement regarding the retirement benefits, Doug's attorney referred to the possibility that Doug might quit his employment and Anne's attorney confirmed that, in that circumstance, the parties agreed that Anne would get her share of whatever Doug got.[8] That is precisely what Anne has received in

5. Doug became eligible for retirement on July 1, 1990. The amended decree was entered on October 25, 1990, more than three months after Doug had become eligible for retirement.

6. The amended decree provided that, if Doug did decide to reinvest in the plan, Anne would have the same *"option"* to reinvest. Again, the language clearly indicates that Doug was not required to reinvest in the plan upon rehiring.

7. In fact, at the hearing on this matter, Anne permitted the representative of the plan to leave, conceding that Doug's right to reinvest in the plan had expired.

8. Specifically, the following exchange took place: THE COURT: That is what I wanted to clarify.

MR. OSBORN [for Doug]: And you've got to put in there if he leaves.
MS. CANTOR [for Anne]: I was getting to that. And that will be payable when he does retire. Mrs. Stine will remain the beneficiary on the life insurance policy until he retires. If he retires prior to the date that he is entitled to retirement, she will get a proportional share of any benefit and any—.
MR. OSBORN: Retirement disability; quitting, any severance.
THE COURT: *So she gets her share of whatever he gets; right; she gets her share of whatever he gets?*
MS. CANTOR: *Yes.*
(Emphasis added.)

this case. She collected her one half of 150/240 share of the accumulated contributions that Doug received upon termination of his employment with DPS. Doug has *not* received any other benefits and, given his failure to reinstate his retirement upon rehiring, he will not receive any other benefits accumulated during the parties' marriage.

In sum, the trial court did not err in determining that Doug had satisfied his obligations under the amended decree by paying Anne her one half of 150/240 share of the benefits received.[9]

## CONCLUSION

The order denying the motion for new trial is affirmed.

KLEINSCHMIDT, C.J.; and FIDEL, J., concur.

9. Anne's briefs appear to seek modification of the decree itself. She asks the court to order Doug to reinvest in the retirement plan and pay her $592.81 per month until he begins to receive benefits from the Retirement System, or, alternatively, to remand the case for the determination of a lump sum payment based upon the present cash value of her share of pension benefits as of July 1, 1990.

As discussed in the main text, this appeal is limited to a review of the trial court's denial of Anne's motion for a new trial. This court lacks jurisdiction to review the original decree and grant the type of relief requested in her briefs. *See Wendling v. Southwest Savings & Loan*, 143 Ariz. 599, 601, 694 P.2d 1213, 1215 (App.1984). Accordingly, whatever valid arguments Anne may have had in support of her preference for receiving her share of the retirement benefits through a present cash value payment, she may not raise them at this time in an effort to modify the original or amended decree.